| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: August 4, 2014 |

-------------------------------------------------------------X
:
DONNESHIA HENDRICKS, Individually and :
As Administratrix Ad Prosequendum of the :
Estate of RICHARD JAMES FLUDD, JR., a :
Minor, Deceased, :
:
                   *Plaintiff*, :    13 Civ. 2787 (PAC)
:
  -against- :
:    **OPINION & ORDER**
CITY OF NEW YORK, NEW YORK CITY :
ADMINISTRATION FOR CHILDREN'S :
SERVICES (ACS), RONALD E. RICHTER, :
TANZANIA STONE, and REGINALD :
SMITH, :
:
                 *Defendants*. :
:
-------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

      Plaintiff Donneshia Hendricks makes claims under 42 U.S.C. § 1983 and pendent state-law claims relating arising out of the death of her infant son, Richard James Fludd, Jr. ("the Decedent"). She alleges that Reginald Smith, with whom she was in a relationship, beat the Decedent to death, but Smith is not a state actor, and there is no Section 1983 claim against him. Plaintiff alleges that the City of New York, the Administration for Children's Services ("ACS"), its Commissioner, Ronald Richter, and an ACS caseworker, Tanzania Stone, (collectively, "the Municipal Defendants") failed to take appropriate steps to prevent the Decedent's death. The Municipal Defendants now move to dismiss Plaintiff's Section 1983 claims under Rule 12(b)(6),

1

and to decline to exercise supplemental jurisdiction over the remaining state-law claims.[1]  For the reasons set forth below, the motion is granted.

## BACKGROUND

The Court accepts as true the tragic facts alleged in the Amended Complaint.

Plaintiff, a New Jersey resident, was in a relationship with Defendant Reginald Smith. (*See* Am. Compl. ¶ 29; Pl.'s Opp'n at 7.)  Unbeknownst to her, Smith was subject to a protective order issued by the Bronx County Family Court, which prohibited him from being in contact with children because he had allegedly physically abused his biological daughter and had "violent propensities."  (*Id.* ¶¶ 23, 25.)

Sometime in late November or early December 2011, Tanzania Stone, an ACS caseworker, visited Smith's apartment while Plaintiff and the Decedent were there.  (*Id.* ¶ 27.) Stone did not introduce herself to Plaintiff as an ACS caseworker, but Stone "was told and/or learned of Plaintiff's relationship with Defendant Smith, and of [Decedent]'s regular presence in the home and/or contact with Defendant Smith."  (*Id.* ¶¶ 28–29.)  While there, Stone served the protective order on Smith, "knowing it would agitate him."  (*Id.* ¶ 31.)  Stone knew that Smith was in violation of the protective order by having contact with the Decedent and "failed to take action to enforce" the order or to warn the Plaintiff about Smith's violent propensities.  (*Id.* ¶¶ 32–34.)

Approximately two months later, on January 25, 2012, Plaintiff left the Decedent in Smith's care in his apartment in the Bronx.  (*Id.* ¶ 35.)  Smith allegedly beat the Decedent, which led to his death later that day.  (*Id.*)  While at the hospital, Plaintiff met with ACS caseworker

---

[1] This motion (ECF No. 19) supersedes and renders moot the Municipal Defendants' motion to dismiss the initial Complaint (ECF No. 10).  Smith has neither appeared in this case nor filed a motion as to the claims against him.

2

Stone, who "informed Plaintiff for the first time that Defendant, Smith, was under a court order to stay away from children because he was under investigation for child abuse and assumed to be violent." (*Id.* ¶ 39.) Smith was charged with murder two days later. (*Id.* ¶ 37.)

Plaintiff claims that the Municipal Defendants are liable for the Decedent's death because (1) Stone's discussion of the protective order with Smith in late November or early December 2011 "agitated" him to violence, (2) the Municipal Defendants failed to enforce the protective order served on Smith, and (3) the City maintained constitutionally inadequate policies and procedures to prevent such tragedies. Plaintiff also asserts various state-law tort claims.

## DISCUSSION

### I. Legal Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That is, a complaint must "nudge[] [the plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Nevertheless, the Court must accept well-pleaded factual allegations as true, "drawing all reasonable inferences in the plaintiff's favor." *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant acted "under color of state law," and (2) "the conduct complained of . . . deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). The Due Process Clause of the Fourteenth

Amendment to the U.S. Constitution does not "require[] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cnty. Dep't of Soc. Svcs.*, 489 U.S. 189, 195 (1989).  "Its purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.*  Thus, "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) (concluding that "respondent did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband").

The Second Circuit recognizes a very limited exception where "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009).  Under this "state created danger" doctrine, "the state[ has a] duty to protect a person from private violence when the state itself has placed that person at risk." *Pena v. DePrisco*, 432 F.3d 98, 108 (2d Cir. 2005).  Thus, when "state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983." *Id.* at 111.  Such a circumstance is to be distinguished from "[a] failure to interfere when misconduct takes place, and no more, [which] is not sufficient to amount to a state *created* danger." *Id.* at 110.

In addition, under the "special relationship" doctrine, a state actor "assume[s] an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment." *Lombardi v. Whitman*, 485 F.3d 73, 80 n.3 (2d Cir. 2007).  In such circumstances, "[t]he affirmative duty to protect arises not from the State's knowledge of the

individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200.

## II. Analysis of the Section 1983 Claims

Here, Plaintiff has neither adequately alleged a "state-created danger" nor a "special relationship" between the state and the Decedent that could form a basis for the Municipal Defendants' liability under Section 1983.

There are no allegations, for instance, that the Municipal Defendants encouraged anyone to harm the Decedent. Rather, the gravamen of the Amended Complaint is that the Municipal Defendants failed to act while knowing that the Decedent might be in danger. Of course, Plaintiff's relationship with Smith arose through her own volition, and not as the result of any fault of the Municipal Defendants. Their alleged failure to give Plaintiff notice of the potential danger does not rise to the level of a constitutional claim. The Municipal Defendants argue that confidentiality laws constrained them from disclosing details about the protective order to Plaintiff, but the Court does not rely on that argument. The Municipal Defendants had no constitutional obligation to warn because they had no role in creating the dangerous situation that allegedly caused this tragedy. *See Okin*, 577 F.3d at 428 ("[T]he Due Process Clause may be violated when police officers' *affirmative* conduct—as opposed to *passive* failures to act—creates or increases the risk of private violence, and thereby enhances the danger to the victim.").

Nor does the allegation that Stone, the ACS caseworker, somehow provoked Smith or tacitly encouraged him to beat the Decedent withstand scrutiny. First, her presence in Smith's apartment to serve the protective order and discuss it with him could not itself be an improper provocation. It is implausible to suggest that Ms. Stone should have expected that such a routine visit might lead to a murder. Second, it is implausible that her visit "in late November or early

5

December 2011" would have "agitated" Smith until two months later, on January 25, 2012, when Smith beat the Decedent.  If there were any initial agitation, the causal link had long since been severed.  Moreover, there is no plausible allegation that Stone somehow conveyed her implicit encouragement of child abuse by "affirmative conduct that created or increased the risk of violence to the victim."  *Cf. Okin*, 577 F.3d at 430 (police officers could be found to have "implicitly but affirmatively encouraged . . . domestic violence" where they discussed football with the suspect who allegedly beat and choked his girlfriend, declined to arrest him despite his admission that "he could not 'help it sometimes when he smacks [her] around,'" and failed to file incident reports or interview the suspect in response to the victim's numerous complaints); *Pena*, 432 F.3d at 110 (plaintiffs stated a claim that defendants "communicated to [officer] Grey that he was free to drink to excess and drive in that condition" where fellow officers were drinking heavily with him, and where his supervisor asked him to drive).

Finally, there are no plausible allegations of a "special relationship" that would have affirmatively obligated the state to protect the Decedent.  As set forth above, such special relationships usually arise when the state has taken a person into custody and thus assume responsibility for the person's care.  *See, e.g., Lombardi*, 485 F.3d at 80 n.3.  Here, the Decedent was not in state custody, and contrary to Plaintiff's argument, there is no applicable "analog[y] to a foster child's relationship with [a] social services agency."  (Pl.'s Opp'n at 15.)  If a protective order prohibiting Smith's contact with children could create such a "special relationship," then the state would have a constitutional duty to protect every child.  Such a broad duty is inconsistent with *DeShaney*'s teaching that the Due Process Clause is "not . . . a guarantee of certain minimal levels of safety and security."  489 U.S. at 195.

Plaintiff has not plausibly alleged a constitutional violation.  The Supreme Court's

6

statement in *DeShaney* is apt:

> [The State's] failure to [protect the Decedent]—though calamitous in hindsight—simply does not constitute a violation of the Due Process Clause. . . . Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [the Decedent] and his mother to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State . . . , but by [Mr. Smith]. The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.

489 U.S. at 202–03.

### III. Pendent State-Law Claims

Plaintiff's remaining claims are pendent state-law claims brought on the basis of supplemental jurisdiction: wrongful death, conscious pain and suffering, and negligence. The Court, however, "decline[s] to exercise supplemental jurisdiction" over these state-law claims because it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); *see Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 437 (2d Cir. 2011) ("[I]f a plaintiff's federal claims are dismissed before trial, 'the state law claims should be dismissed as well.'").

### CONCLUSION

The Municipal Defendants' Rule 12(b)(6) motion to dismiss the Section 1983 claims in the Amended Complaint is GRANTED. The Court declines to exercise supplemental jurisdiction over the remaining state-law claims. The Clerk of Court is directed to terminate the pending motions and to close this case.

Dated: New York, New York
August 4, 2014

SO ORDERED

PAUL A. CROTTY
United States District Judge